Our first case is Rio Hondo Land v. EPA, and we are ready to hear from the petitioner. Good morning, Your Honors. My name is Steven Sugarman. I am here on behalf of Petitioner Rio Hondo Land & Cattle Company. May it please the Court. This case concerns the water quality in the Rio Ruidoso which flows through my client's lands, ranch lands, in south-central New Mexico. The Rio Ruidoso has been designated by the New Mexico Environment Department as a high-quality cold-water fishery, which is the highest use designation available under New Mexico water quality standards, and which reflects the important recreational purpose that this river serves in arid New Mexico. In 1998, the New Mexico Environment Department determined that the Rio Ruidoso is in non-attainment status for plant nutrients, and accordingly, the Rio Ruidoso was added by the Environment Department to the state's 303D list of non-attainment impaired waters, where it remains until today. There are various adverse impacts that are associated with plant nutrients. Most importantly, as it affects my clients, the impaired water quality resulting from the excess plant nutrients both impairs the recreational use of the water, and it also makes it impossible for my client, when the total plant nutrients are at high levels, to use their irrigation gates for irrigation because of algae blooms that block the irrigation gates. Notwithstanding the long, unresolved problem with excess plant nutrients in the Rio Ruidoso, in 2017, the EPA issued a renewed discharge permit to the wastewater treatment plant jointly owned and operated by the village of Ruidoso in the city of Ruidoso Downs, which authorizes significant backsliding in the total nitrogen effluent which the plant may discharge into the Rio Ruidoso. Now, when you argue about backsliding and the application of that provision, does that rest upon and relies upon a state-authorized TMDL? Yes, absolutely, Your Honor. The provision continues to reply. However, as the parties have noted in their briefing... I thought that would exclude it from application of the backsliding provision. No, there is a statutory exception which applies in very limited circumstances when certain circumstances of a state-approved TMDL are in place, as is the case here. So there is a relationship, it's true, between a TMDL and an MPDES permit. But the important point, Your Honor, to remember is that TMDLs and MPDES permits serve very different... I'm sorry, we've lost your audio. Go ahead, see if I can hear you. Are you able to hear me? There we go, okay. Sorry about that. The TMDLs and the MPDES permits serve very different purposes and they are developed and implemented through separate processes. Even the EPA admits this in its brief at pages six and seven. Again, don't we have the provision 13.13.d.4 that is the exclusion that I'm speaking of, that is the reliance on the state TMDL? Your Honor, with all due respect, that is incorrect. The provision that you just cited is a statutory exception to backsliding. And what that statutory provision states is that if a effluent limitation is based on a TMDL, it can be accepted from the backsliding statutory prohibition, but only under two limited circumstances. First, if the particular effluent limitation at issue is the product of a waste load allocation in a TMDL. And second, if the inclusion of the relaxed effluent limitation will nonetheless ensure attainment of water quality standards. So, Your Honor, again, this is a very important point and I'm happy to spend time with you on it. The TMDL is a long-term watershed scale plan for attainment of water quality standards over a long period of time. What it does is it contemplates both what the point source pollutions are and what the non-point sources of the pollution are. And it forecasts the mitigation measures that might be implemented in the future by a state in order to achieve water quality standards. The EPA has said time and time again, and courts have also made this finding that a TMDL is merely a starting point for an effluent limitation. It's the starting point, it's an informational tool. And in fact, the EPA has found that prior to implementation of a TMDL, that TMDL is really only a paper plan for attainment of water quality standards. In this case, it's important to recognize that the TMDL has not yet been implemented. What the TMDL says on its face is that it will be implemented at the time that New Mexico develops a watershed-based plan, which will affect the non-point source reductions that are planned for some time in the future. And the estimate of the environment department is that will take 10 to 20 years. But notwithstanding that, Mr. Sugarman, isn't it true, to follow up on Judge Briscoe's questions, that the 2016 TMDL specifically contemplated assurance of the 2001 water quality standards. You all had, Rio Hondo had challenged that in the New Mexico State Court. The New Mexico appellate courts have rejected that challenge. So, to the extent that the issue is whether 1313 D4A essentially contemplates satisfaction of the water quality standards, isn't that already determined through the approval of the 2016 TMDL? Essentially, what you're asking, Your Honor, I think, is whether the exception set forth in 1313 D4A applies in this case. Well, let me rephrase it because I don't know that that's my question. One of the arguments that you have raised in your briefs, I think you're raising now, is the 2017 permit simply does not satisfy the water quality standards that were set forth in 2001. That's exactly the same issue that was litigated with regard to the contest for the approval of the 2016 TMDL. The New Mexico appellate court has concluded that the 2016 TMDL is a reasonable way to achieve the 2001 water quality standards. So, how can we approve your challenge to the 2017 permit that is predicated on a challenge that's already been rejected in the context of the 2016 TMDL? Two things, Your Honor. First of all, my challenge in the New Mexico Court of Appeals was very limited in scope. It was based upon the New Mexico Environment Department's decision to use two different critical flows for total phosphorus and total nitrogen, the two plant nutrients at issue. I argued to the New Mexico Court of Appeals that that was impermissible. The New Mexico Court of Appeals disagreed with me. So, the issue of attainment was not at issue in that appeal. Can we collaterally challenge, can we, under full faith and credit, or are you collaterally challenging the correctness of the 2016 TMDL? No, I am not doing that because I would not be permitted to do that in this case. The second thing, Your Honor, that is important is that this precise issue has been already looked at by the Ninth Circuit in Friends of Pinto Creek. That's a case where the EPA also relied upon a state-approved TMDL to develop effluent limitations in a point source discharge permit. What the Ninth Circuit said there is, well, the improvements that are contemplated by the TMDL and which purportedly justify the issuance of this permit have yet to be achieved. They're speculative. They're conjectural. They're hypothetical. There's absolutely nothing in this record that indicates that those improvements have been made or how they will be made in the future. That is precisely... Excuse me, in Pinto Creek, the court there was looking at the safety clause that we have in these provisions? No, the safety clause was not an issue in Pinto Creek, Your Honor. Okay, do we have a safety clause issue in this case? Yes, the safety clause is of no use in this case to the respondents. The safety clause would only help me and what the safety clause says is that if any of the exceptions apply, the exception can still not be used by the EPA if attainment of water quality standards will not be assured. Going back to the question that Judge Bachrach issued, I think what's really critical for this court to remain aware of is that the watershed-based plan, which is contemplated in the 2016 TMDL does not exist. The New Mexico Environment Department simply says at some point in the future, we will develop a watershed-based plan for the Rio Ruidoso and we will achieve non-point source reductions through that watershed-based plan. But that watershed-based plan, again, it's conjectural, it's hypothetical, it's speculative. The means by which the non-point source reductions will be achieved have not been selected and as importantly, there is absolutely no indication in the record where the funding will come for for the achievement of these watershed-based plans. Why does that matter? A TMDL, as I understand it, is always aspirational. And so I understand your argument, I think, but what I'm having trouble understanding, and if you could just explain it to me, Mr. Sugarbett, is why does it matter if the watershed-based plan that was contemplated in the 2016 TMDL hadn't been implemented at the time that the 2017 permit was issued? I just don't understand what does that have to do with anything? I'm not arguing, Judge Bachrach, that the TMDL had to be fully implemented at the time that the 2017 permit was issued. What I'm arguing is that the 2017 permit was premised on the notion that non-point source reductions would be achieved that would offset the increase in total nitrogen introductions into the stream allowed by the permit. Yet there is simply no plan whatsoever or any funding to achieve those non-point source reductions. If there were a watershed-based plan in place, and if the watershed-based plan were in the process of being implemented, then we would be in a very different case. But that's not the case that we're in right now. The case that we're in right now is that New Mexico and the EPA in turn are simply hypothesizing and speculating as to what might happen in the future, and there is absolutely no plan or funding mechanism to achieve those non-point source reductions, which would offset the increase in total nitrogen discharges that are allowed by the MPDS permit, which is really focused on the real-time conditions in the river. My time is very short right now. I'm going to use this one last point to say, this is a case, Judge Briscoe, that's very similar to your decision in Wild Earth Guardians versus BLM, where there's simply no explanation whatsoever by the EPA permit writer as to how he reached his conclusions. What we see in the fact sheet are two sentences which purport to be an explanation, but which are really nothing more than a cut and paste of two sections from, two sentences rather, from the TMDL. If you would look at the joint deferred appendix on page 409, you'll see the explanation that was given by the EPA permit writer for the backsliding. That's two sentences. And then if you look at the joint deferred appendix on page 369, you'll see that those are the exact same two sentences, word for word, that the Environment Department included in its TMDL. This is a case where the EPA's permit writer simply abdicated his duty to conduct any inquiry or analysis as to the impacts of the backsliding, which he authorized in the 2017 permit. Thank you. Thank you, counsel. We're ready to hear from the respondent. Thank you, Your Honor. May it please the court, Philip Dupre for the United States and for EPA. To pick up on the last point Mr. Sugarman made, I think here when you have a contemporaneous TMDL and permit, the permit writer had no independent obligation to investigate whether or not the TMDL would assure water quality standards when no new information was presented. Your audio is cutting out. Your audio is cutting out. I apologize, Your Honor. Is this better? Yes. Go ahead. Okay, thank you. So, under the way the statutory structure is set up, the permit writer had no independent obligation to ensure that the TMDL's conclusion that water quality standards would be met. There's no independent obligation for the permit writer to do so because here we had a contemporaneous, effectively contemporaneous TMDL and permit application. And I think it's important to note, as petitioner conceded before the Environmental Appeals Board, they were not relying on any new information submitted to the permit writer for the permit writer to rely on in rejecting the permit. In other words, what Mr. Sugarman argues is effectively a collateral attack on the TMDL. And petitioner wanted the permit writer to say, notwithstanding the TMDL, I don't think water quality will be achieved and therefore reject the permit application. Mr. McRae, didn't the 2016 TMDL specifically contemplate a need to reduce non-point total discharges by 55 pounds a day for nitrogen? Yes, it did. And I think it's important to note that while, as I believe Your Honor pointed out, the TMDL is aspirational, there are requirements written into the permit itself. And so in the 2017 NPDES permit, the Wastewater Treatment Plant has an obligation to hook up 200 septic systems to decrease non-point sources of nitrogen into the Ruidoso. So that is an obligation under the permit. Am I wrong that that would account for about 1 11th of what the TMDL required? Isn't that about five pounds a day? The 200 households? I believe your math is correct, Your Honor. But off the top of my head, I will not attest to that. All right. So if we credit the 2016 TMDL and say, and Mr. Sugarman agrees that he's not collaterally challenging the TMDL, so how does the 2017 permit conform to the 2016 TMDL if there's no explanation for the other 50 pounds that have to be reduced daily for total nitrogen? I guess I would disagree that the TMDL requires 50 pounds to be reduced immediately for its water quality assumptions to be met. Under the TMDL, it delineates between point source waste loads and allocates those as such. You know, if the question is whether or not... I missed out. Could you say that again? It differentiates between what and what? The TMDL differentiates between point source discharges and non-point source discharges. Point source discharges are those that come from a direct discharge, such as in this case, the wastewater treatment plant. And importantly, I think the wastewater treatment plant is the only point source discharger into the Rio Ruidoso. So when the TMDL envisioned that it could meet, that the Rio Ruidoso could achieve water quality standards with the waste load allocation in the TMDL, that was basically their specific expectation or assumption for the wastewater treatment plant at issue. Now, they have separate assumptions regarding what will happen with non-point sources. But again, those expectations for non-point sources are not at issue in the issuance of this permit. So I think to your point, Your Honor, I would say, roughly speaking, every five years, you need a new NPDES permit and a new permit replaces the old one. And certainly, if there is evidence that New Mexico has failed to meet the reductions in non-point source waste load allocations that were envisioned in the 2016 TMDL when this permit is renewed or reissued, that certainly would be information that would be relevant to the permit writer. But what Mr. Sugarman effectively argues is the TMDL was approved with the expectation that New Mexico would be implementing a plan to reduce non-point source discharges, but it was impermissible for EPA to approve a permit based on that TMDL, even though there was no evidence that New Mexico had not in fact met any of their obligations or expected decreases under that TMDL. So again, here, you have essentially a contemporaneous TMDL that allocates waste loads between point source and non-point source discharges. And as Judge Briscoe pointed out, the anti-backsliding exception under the Clean Water Act specifically allows for a permit to be relaxed even when the water body is not in attainment, whereas here, the effluent limitation is based on a TMDL that assures the attainment of such water quality standard. And here, the TMDL clearly stated that. And that's the end of the analysis. I mean, it sounds like you're saying that if the TMDL is in existence and the EPA can look at that and say, well, if they've assured water quality, then we're good. And the EPA really has no responsibility beyond that. Is that right? That's correct. I would note that there may be additional responsibilities where new information is presented to the agency. But here, where the TMDL was approved immediately before the permit was issued and no new information was submitted to the permit writer, it certainly was reasonable. And again, that's the standard review here, whether or not the permit writer's decision was reasonable. So yes, the short answer is yes. The longer answer is yes, because of the particulars here. Can I ask you? You know, I do want to point out. Oh, sorry. Oh, go ahead, Your Honor. Okay, I didn't mean to talk over you, Mr. Dupre, but I don't want to interrupt the flow of what you want to present. But I'll just tell you, one of the questions that I had, I just never understood it, is how the 2016 TMDL or the 2017 permit would assure the satisfaction of the 2001 water quality standard with regard to the specification of a 1 to 10 ratio between the total phosphorus and the total nitrogen. I think I understand the fact sheet explanation for the 2016 TMDL with regard to the, you know, continuing to use the 4Q3 method for critical flow for phosphorus, but that there is going to be annual median flow to measure critical flow for nitrogen. But what I never saw was, what does that do to the, how does the change in critical flow for the nitrogen at all assure this 1 to 10 or 10 to 1 ratio for nitrogen to phosphorus? Mr. Sugarman showed that there were internal studies showing that the total nitrogen is going to exponentially increase. And so where is the study that says, well, if you increase annual median flow for nitrogen, that there's going to continue to be this 10 to 1 ratio? So, your honor, I'd like to take a step back and clear up any misunderstanding there might be in terms of whether or not the flow, whether or not the discharge of nitrogen is increasing. And in fact, the discharge of nitrogen is decreasing from the wastewater treatment plant. And what the reason that is, is under the prior NPDES permit, I believe it was in 2012, even though the discharge limitations were more stringent than the permitted issue here, the water treatment plant was allowed to implement or use interim limits, which were substantially higher than the permit limits at issue here. So, we're sort of comparing apples and oranges when we say the permit increased the amount of nitrogen being discharged. It increased the nominal permit limits, but it decreased the actual permit limits. And so here we do have a decreasing amount of nitrogen from the 2012 permit to today. Now, to your question of why the TMDL concluded using different flow assumptions that the ultimate ratio could be met, I unfortunately don't have an answer for you. Ensured that it would be met. Ensured that it would be met. I do not have off the top of my head an explanation as for why the court, excuse me, why the TMDL believed that even though you would be increasing the relative amount of nitrogen to phosphorus, that the concentration level would ultimately be met. You know, I would conjecture just a little bit, of course, the goal here is not that you would simply discharging nitrogen and phosphorus into the water at a certain 10 to 1 ratio does not guarantee that the actual ratio in the water is the same because certain nutrients are used up at different rates, you know. So for instance, just because you have one nutrient discharge at a certain level doesn't mean it's actual amount that will be left in the water after a certain amount of time will be the same. So I assume that part of the distinction between this is that nitrogen and phosphorus act differently in the water and thus they are not expected to maintain the same ratio after being discharged. To follow up on what Judge Bacharach asked about the 2001 water quality standard, is that relevant here or do we look only at the 2012 TMDL and permit? Well, I think here you only look at the 2016 TMDL. Right, when you're talking about things increasing, you have to make a comparison. And so what are we comparing the 2017 permit to? We are comparing the 2017 permit to the 2012 permit. And not the 2000 later on, and not the 2001. Correct, Your Honor, correct. Yeah, can I just ask for clarification because I may be misunderstanding. So in the statutory provision that we're talking about, it talks about assuring the satisfaction of the water quality standard. The water quality standard is not in a TMDL, right? That's a state law function and the only time we have a water quality standard, I thought, and tell me if I'm wrong, was in 2001. So I've been thinking that we have to determine whether there was satisfaction of the water quality standard in 2001 by looking at the 2016 TMDL, but I may be wrong about that. So the TMDL is essentially a plan for how an impaired water body can come into attainment with the water quality standard. And I think the reason you have in the statutory language, I believe where it says, the exception to backsliding is allowed if the Q effect of all such revised effluent limitations based on such total maximum daily load or waste load allocation will assure the attainment of such water quality standard. So part of the reason I think that language is included in reference water quality standard is that not every impaired water body has a TMDL. So there may be instances in which the permit writer wouldn't be relying on a TMDL for a finding that the anti-backsliding provision would not be met there. I still don't hear an answer to Judge Vacarac's question. So the issue before the court is whether or not the NPDES permit reasonably relied on the 2016 TMDL's conclusion that if those waste load allocations were met, it would ensure attainment with the state's water quality standards. And where do we find the state water quality standard in this case? We are comparing the 2017 permit to? The state water quality standard is discussed in the 2016 TMDL. It is a prior existing document. Okay. So we don't care about the 2012 permit and we don't care about the 2001 water quality standard? Well, we care about those to the extent they relate to the decision that EPA made. And so EPA made the decision to increase the nominal limit of effluent discharge from the 2012 permit to the 2017 permit. And the reason that is acceptable under the statutory exception is because it's based on a TMDL. That ensures attainment of the water quality standards. And those are the water quality standards set forth in 2001. Okay. You were cutting out in what year? In 2001, I believe. Okay. Now I'm sorry. You were cutting out. If you could restate your statement. I apologize. I'm not sure what the issue is with the audio. The relevance of the 2001 water quality standards is that those are the standards that the TMDL that was issued and has been upheld in state court in 2016 were designed to achieve. And the TMDL concludes that if the waste load allocations that are set forth therein between point sources and non-point sources are met, then water quality standards will be achieved. The really only issue here for the court is the 2017 permit clearly adopted or implemented those waste load allocations in the 2016 TMDL. And as a result, they satisfy the anti-backsliding exception under the statutory provision, even though those discharge limits are nominally higher than what were put in the 2012 permit. All right. Thank you. You've gone over on your time. Mr. Sugarman, if you want to take three minutes and respond. I know it's hard when you weren't given notice that this would happen, but say what you would like to say. And you'll have to turn on your audio again. Thank you for that reminder. I want to just clear up a couple of things. First of all, a council statement as to the fact that the discharge of total nitrogen into the river is decreasing is false. That's not correct. And there is absolutely no indication in the record that that's true. What council was talking about, I believe is that the 2012 permit contained an interim limitation, which was higher than the final limitation of the 2012 permit. But we have to remember that the final effluent limitation in the 2012 permit was 18.9 pounds of total nitrogen a day. And the EPA obligated the permittee to achieve that standard by the end of the permit period. Then when the 2017 permit was issued, the amount of mass load that the permittee was allowed to discharge was doubled to 37.8 pounds a day. So that's just the fact of the matter. Insofar as the concentration is concerned, Judge Bachrach, you're exactly correct. And the 2016 TMDL at JDA joint appendix page 370, the environment department concedes that with the waste load allocation that was developed in that 2016 TMDL, that the effective concentration of the discharge will be 2.41 milligrams per liter. So you can see that the proportion, that 10 to one ratio that the environment department had found necessary has been left far beyond. We've gone from 10 to one to 24. To one, the council's speculation and surmise as to why that's insignificant, obviously cannot be countenanced by this court as a premise for the decision. This is something that the EPA permit writer simply did not consider. Ostensibly, the permit writer considered the increase in the mass load limitations, but there is absolutely nothing in the fact sheet or the record which shows that the permit writer even gave a second thought to what the impacts would be of the elimination of the concentration limit. A permit writer- Mr. Sugarman, can I ask you the same question that I asked Mr. Duprey? Is the 2001, to find the water quality standard that we're talking about, do we look back to Judge Briscoe's question, do we look to the 2016 TMDL or the 2001 water quality standard? Only the 2001 water quality standard. The 2001, the statute and the regulations, the whole point of the Clean Water Act is to assure that NPDES permits assure attainment of water quality standards. Those water quality standards were set by the New Mexico Water Quality Control Commission in 2001. The total phosphorus standard, the total phosphorus is a numeric standard. The total nitrogen standard is a narrative standard and the environment department has translated the narrative standard into a numeric standard as it's required to do using guidance that's been provided by the EPA. And the application of that guidance has led the New Mexico environment department to conclude over and over again that the appropriate standard for total nitrogen in the Rio Redoso is 1.0 milligrams per liter. That's been the fact since 2001. Thank you. In short- Thank you, you're over your time. Are there any other questions from the panel? Okay, we will submit this case for decision and we appreciate the arguments of council. Thank you.